# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

OLIN CORPORATION,            )
                                        )
                Plaintiff,      )
                                          )
vs.                                     )
                                        )
THE UNITED STATES DEPARTMENT,  )   Case No. 99-1127-CV-W-2-ECF
OF THE ARMY,             )
                                        )   **REDACTED ORDER**[1]
                Defendant.     )
                                          )
and                                        )
                                        )
ALLIANT TECHSYSTEMS, INC.    )
                Intervenor-Defendant.   )

## ORDER

Currently pending before the Court is plaintiff Olin Corporation's Motion for Preliminary Injunction (Doc. # 21). Plaintiff moves the Court pursuant to Fed.R.Civ.P. 65 to issue an order preliminarily enjoining performance of and transition activities under two contracts awarded by the Defendant, United States Department of the Army to Intervenor, Alliant Techsystems, Inc.

### I. BACKGROUND

The U.S. Army Industrial Operations Command ("IOC") is responsible for

---

[1]This Order was originally issued under seal on February 7, 2000. The parties subsequently filed a joint motion to release a redacted version of the Order to the public. That motion was granted and this Order incorporates the parties suggested redactions. Brackets identify where material has been deleted.

acquiring small caliber ammunition and related services for the Department of

Defense (Army, Navy, Air Force and Marines) and other customers. The IOC also

has a number of Government owned, contractor operated ammunition plants, one of

which is the Lake City Army Ammunition Plant ("LCAAP"). Plaintiff, the Olin

Corporation ("Olin"), has operated the LCAAP facility for the Army since 1985

under two successive contracts. The first contract was in effect from 1985-1991, and

the second has been in effect since 1991 and is currently set to expire on April 2,

2000.

### A. **The Request for Proposals**

On September 11, 1998, the Army issued the Source Selection Evaluation Plan

for the instant procurement. The Source Selection Evaluation Plan established the

Source Selection Evaluation Board ("SSEB"), to evaluate each proposal under the

specified evaluation criteria, participate in negotiations and report facts, findings and

recommendations to the Source Selection Advisory Council ("SSAC"). The SSAC

was responsible for reviewing the SSEB's findings and recommendations, providing

comments on each offeror's proposal to the Source Selection Authority ("SSA") and

providing written recommendations for award to the SSA. The SSA is the person

who directed the Source Selection process and who after considering the

recommendations of the advisory boards, made the decision as to what company the

contract should be awarded to.[2]

On September 29, 1998, the Army issued Request for Proposals No. DAAA09-98-R-0121 ("RFP 121") - A Requirements contract for the production of 29 contract line items of small caliber ammunition. This was to be a firm fixed price contract with economic price adjustments for copper. The RFP contemplated that the Army and other Dept of Defense ("DoD") entities would purchase all of their ammunition from the awardee for a period of ten years.

The second procurement was conducted pursuant to Request for Proposals No. DAAA09-99-R-0088 ("RFP 0088") - This was a twenty-five year contract for the use of the Army's Lake City Army Ammunition Plant ("LCAAP"). The solicitation provided that this would either be a firm fixed price or no cost contract with some possible cost reimbursement scopes of work. It was contemplated that the contracts would be awarded to the same offeror who would use the LCAAP facility to manufacture small caliber ammunition for the Army and other DoD entities.

The procurements were conducted as negotiated procurements under Part 15 of the Federal Acquisition Regulations ("FAR") and the RFP provided that the Army would use the best value tradeoff source selection methodology.   FAR § 15.101-1

---

[2] Gary Tull, an Army acquisition official assigned to Army Material Command headquarters in Washington, D.C. is the SSA who made the decision to award the contract to Alliant. He became the SSA for this procurement in May 1999, replacing the SSA who had supervised all previous aspects of the competition up to that point.

Tradeoff process states:

> (a) A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror.
> . . .
> (c) This process permits tradeoffs among cost or price and non-cost factors an allows the Government to accept other than the lowest priced proposal. The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406.

The RFP's provided for a two-phase evaluation. In the first phase, a competitive range would be established based upon an assessment of three factors: 1) Technical Capability; 2) Past Performance and 3) Cost. Each of these factors were considered to be of equal weight. On November 6, 1998, four offerors submitted initial proposals. On December 4, 1998, the Army determined that all four offerors were in the competitive range.

In phase two, the RFP's provided that the proposals would be evaluated by the same three factors and additionally, the proposals would be evaluated through a risk assessment. The risk assessment was to include an identification of the relative strengths, weaknesses and deficiencies among the proposals which would form the basis for the overall risk rating for each proposal. The ratings which could be assigned as a result of the Risk Assessment were:

1. Low Performance Risk - Virtually no doubt exists that the offeror will successfully perform the required effort.

2. Moderately Low Performance Risk - Little doubt exists that the offeror will successfully perform the required effort.

3. Moderate Performance Risk - Some doubt exists that the offeror will successfully perform the required effort.

4. Moderately High Performance Risk - Moderate doubt exists that the offeror will successfully perform the required effort.

5. High Performance Risk - Significant doubt exists that the offeror will successfully perform the required effort.

**B. <u>The Evaluation Criteria</u>**

### 1. Past Performance

Originally, the Past Performance ratings from Phase I were to carry through to Phase II, but an amendment to the RFP reopened discussions on Past Performance to obtain information on contract performance for the past three years. RFP 121 required offerors to identify the government and commercial contracts received by the offeror in the three years prior to the closing of the solicitation and provide a summary of each contract identified and answer the following questions for each contract.

(A) How has the offeror manufactured in house and delivered large volumes of center-fire ammunition?

(B) How has the offeror manufactured in house a wide range of center-fire ammunition?

(C) How has the offeror's production/quality system detected in house production problems and resolved them?

(D) How has the offeror identified technical data discrepancies and taken

corrective action?

(E) How has the offeror demonstrated vendor control, including handling of non-conforming materials and hardware?

## 2. Technical Capability

RFP 0088 provided that the proposals would be evaluated under the following four sub-factors:

1. What is your plan to deliver peace time requirements for small caliber ammunition at the best cost and quality, on time for all DOD customers? All production items need to comply with quality requirements to include NATO approved U.S. design.
   a. Element 1: Producibility/Delivery Schedule
   b. Element 2: Quality

2. What is your plan to provide R&D capability for undefined requirements?
   a. Element 1: In House R& D Capability
   b. Element 2: Production Process
   c. Element 3: Critical Skills

3. What is your plan to provide capacity for replenishment?

4. What is your plan to develop/execute a future strategy for LCAAP and NATO Test Facility that makes sense?

Subfactors 1 and 3 were relatively equal and significantly more important that subfactors 2 and 4, which were also relatively equal. All elements under the subfactors were relatively equal.

### 3. Cost

Both the RFP's provided that cost is net government outlay. The facilities use contract awarded was to be either a no-cost or a firm fixed price contract. All of the

offers proposed to accept the contract on a no-cost basis, therefore the cost evaluation was based entirely on the proposed prices for ammunition.   To evaluate the proposed prices, the Army specified a minimum quantity and a maximum quantity for each of the 29 types of ammunition and also specified the evaluation point, or best estimated quantity for each type of ammunition.  Offerors proposed prices for orders within the range between minimum and maximum quantities for each type of ammunition.  The evaluated price was to be determined by calculating the total price of each type of ammunition under three scenarios and then calculating a weighted average of those prices.

## C. **The Evaluation Results**

On the Technical Capability Evaluation ratings,  Olin and Alliant both received Excellent ratings for every sub-factor and element.   On the Past Performance Factor, Olin received a rating of Excellent on sub-factor 2 (how the offeror manufactured in house a wide range of center-fire ammunition) and 4 (how the offeror had identified technical data discrepancies and taken corrective action). Whereas Alliant received only a Satisfactory rating for sub-factor 2, and a Good rating for Sub-factor 4.    Alliant received the lowest overall rating among the offerors for past performance.   The chart summarizes the Past Performance Ratings for Olin and Alliant:

| Sub-factor | Olin | Alliant |
| --- | --- | --- |
| Sub-factor 1 | Excellent | Excellent |
| Sub-factor 2 | Excellent | Satisfactory |
| Sub-factor 3 | Good | Good |
| Sub-factor 4 | Excellent | Good |
| Sub-factor 5 | Good | Good |

Under the Cost Factor, the offerors submitted the following bids:

Olin:  $1,292,070,525

Alliant:  $1,100,196,241

With regard to the Overall Risk Assessment, Olin was ranked as having a low performance risk (virtually no doubt exists that the offeror will successfully perform the contract). Alliant received a Moderate Performance Risk (some doubt exists that the offeror will successfully perform the required effort).

The SSEB and SSAC met with the SSA four times in order to brief the SSA on the procurement and to discuss their findings. The SSEB and SSAC also presented the SSA with documents documenting the relative strengths and weaknesses of the proposals. However, the SSA asked the SSEB and SSAC to "go back and come back with another evaluation because I was a little bit concerned about the initial evaluation and that it didn't quite document well enough the differences in Alliant, Olin and [   ]. . .." (GAO Hearing Transcript, p. 98-99). "I asked them to go back.

I asked them to go back and relook at their evaluation to ensure that they had essentially dotted the I's, crossed the T's on their technical and their past performance and their cost comments, because there was insignificant difference in past performance and technical to cost." (GAO Hearing Transcript, p. 100).

The SSEB in response to the SSA's request prepared a memorandum dated July 1, 1999, summarizing the SSEB's findings. (AR II, Tab 40). The SSEB also prepared an additional comparative analysis of the proposals to further identify and quantify the differences among the proposals. (AR II, Tab 42). In its comparative analysis, the SSEB compared and quantified a) projected lot rejection rates and associated costs; b) projected government expenditure for processing ECP, RFW, RFD[3] requests and c) corporate commitment and facility investment. The SSEB also compared the proposals with regard to a) quality to customers; b) readiness to customers due to projected lot failures; c) bid price range differences and d) weight of evaluation factors. The SSAC also prepared three briefing charts for the SSA entitled: "SSAC Small Caliber Ammunition Best Value Discriminators" (AR II, Tab 41); "Summary of Evaluation Factors" (AR II, Tab 43), and "Qualitative" (AR II, Tab 44).

**D.**     **The SSA's Decision**

---

[3] ECP ("Engineering Change Proposals"); RFW ("Request for Waivers") and RFD ("Request for Deviations").

On July 19, 1999, the SSA chose Alliant as offering the best value to the Government. The SSA found that Olin had some advantages over Alliant, such as demonstrated successful performance in manufacturing small caliber ammunition to military specifications, as well as their experience in manufacturing the full spectrum of ammunition required by the solicitation. The SSA also found that Olin had advantages over Alliant in the areas of production quality, because Olin had a higher percentage of initial lot acceptances and lots approved without waiver. The SSA also found that Olin had demonstrated a greater ability to identify and resolve technical problems prior to production. However, the SSA concluded that Olin's slight technical advantages and good past performance were not enough to overcome Alliant's significant price advantage. Alliant's proposal was $192 million dollars lower that Olin's proposal. The SSA noted that although there were increased performance risks associated with Alliant, they were manageable and acceptable risks. The SSA also found that the increased performance risk was mitigated because Alliant planed to use the facilities and a number of the incumbent LCAAP workers. For these reasons, the SSA determined that Alliant offered the Government the best value.

**E. The GAO Bid Protest & Decision**

After the contracts were awarded, Olin filed bid protests with the GAO on August 6, 1999. On August 12, 1999, Alliant's performance on the contracts was stayed pending a decision by the GAO. The GAO held a hearing on October 5,

1999, at which the SSA, Gary Tull, and the Chair of the SSEB, Sharon Nathan, testified.   On November 15, 1999, the GAO denied Olin's protest, stating that "we cannot conclude that the SSA failed to consider the qualitative differences between [the] proposal[s], that his consideration of them was unreasonable, or that this selection decision was either unreasonable or inconsistent with the solicitation." (GAO Bid Protest Decision,  Exhibit 36 attached to Olin's Suggestions in Support,  p. 10.)   Olin filed the instant Complaint challenging the SSA's decision on November 23, 1999.

## II. Standard for Obtaining a Preliminary Injunction

"Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  Dataphase Systems, Inc. v. CL Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981)(en banc).

> In balancing the equities no single factor is determinative.  The likelihood that plaintiff ultimately will prevail is meaningless in isolation.  In every case, it must be examined  in the context of the relative injuries to the parties and the public.  If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits.  Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less.

Id. at 113.

### III. Discussion

### A. Likelihood of Success on the Merits

1. Standard for Review of Agency Decisions

This Court has jurisdiction over this claim pursuant to 28 U.S.C. § 1491 which

provides in part:

> (b)(1) Both the United States Court of Federal Claims and the district
> courts of the United States shall have jurisdiction to render judgment on
> an action by an interested party objecting to a solicitation by a Federal
> agency for bids or proposals for a proposed contract or to a proposed
> award or the award of a contract or any alleged violation of statute or
> regulation in connection with a procurement or a proposed
> procurement.  Both the United States Court of Federal Claims and the
> district courts of the United States shall have jurisdiction to entertain
> such an action without regard to whether suit is instituted before or
> after the contract is awarded.
> . . .
> (b)(4) In any action under this subsection, the courts shall review the
> agency's decision pursuant to the standards set forth in section 706 of
> title 5.

Title 5 U.S.C. § 706, the Administrative Procedure Act states that in reviewing

agency actions, "the reviewing court shall . . . hold unlawful and set aside agency

action, findings and conclusions found to be arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with the law . . ." or "without observance of

procedure required by law. . . ."  5 U.S.C. § 706 (2)(A) & (D).   In this instance,

plaintiff has made both substantive and procedural challenges.   As to the substantive

challenges, it has been stated that "'[a]gency action is arbitrary and capricious only

where it is not supportable on any rational basis.'" Harvard Interiors Mfg. Co. v. United States, 798 F.Supp. 565, 569 (E.D.Mo. 1992), quoting, Brotherhood of Railway & Airline Clerks v. Burlington Northern, Inc., 722 F.2d 380, 381 (8th Cir. 1983).

> In considering whether the [agency] decision is arbitrary and capricious or an abuse of discretion, the . . . decision will be upheld unless [the agency] failed to consider all relevant factors and articulate a rational connection between the facts found and the choice made.

Harvard, 798 F.Supp. at 569, quoting, Action, Inc. v. Donovan, 789 F.2d 1453, 1457 (10th Cir. 1986). "On the other hand, it is arbitrary and capricious 'for an agency not to take into account all relevant factors in making its determination.'" Harvard Interiors, 798 F.Supp. at 569 (citations omitted).

> With regard to the procedural challenges,

> . . . the reviewing court must be satisfied that the agency not only employed procedures which conform to the procedural requirements of the Administrative Procedure Act [and other federal statutes] . . . , but which also conform to the agency's own internal procedures . . . 'even where the internal procedures are possibly more rigorous than otherwise would be required.' Oglala Sioux Tribe of Indians v. Andrus, 603 F.2d 707, 713 (8th Cir. 1979), quoting, Morton v. Ruiz, 415 U.S. 199, 235 (1974).

Harvard Interiors, 798 F.Supp. 569-70. "Nonetheless, procedural irregularities justify judicial reversal of an agency decision only where the are both 'clear and prejudicial.' " Id., quoting, Irvin Industries Canada, Ltd. v. U.S. Air Force, 924 F.2d 1068, 1072 (D.C. Cir. 1990).

> The scope of review is narrow and the Court is expected to exercise
> restraint in deciding whether to set aside agency actions . . . If a rational
> basis exists for the agency's decision, the Court cannot substitute its
> judgment for that of the agency, . . . merely because the Court believes
> the procurement decision "ill-considered."

Marinette Marine v. United States Coast Guard, 973 F.Supp. 1, 3 (D.D.C.

1997)(citations omitted).

It should also be noted that the action currently under review is the decision of

the Source Selection Authority to award the contract to Alliant, and not the

Comptroller General's decision denying Olin's bid protest. The SSA's decision is

considered the "final action" under the APA.; Ensco Environmental Services, Inc. v.

United States, 650 F.Supp. 583, 587 (W.D. Mo. 1986). The Federal Circuit had

regarded the GAO's decision as more of an "expert opinion, 'which [the court] should

prudently consider but to which [the court has] no obligation to defer.'" Harvard

Interiors, 798 F.Supp. at 570, quoting, Delta Data Systems Corp. v. Webster, 744

F.2d 197, 201 (D.C.Cir. 1984).

2. Supplementation of the Administrative Record

In the instant case, plaintiff has requested that the Court supplement the

administrative record with further testimony from the SSA. Plaintiff believes that the

SSA's testimony would help clarify inconsistencies in the record and allow the SSA an

opportunity to explain the rationale for his decision. Alliant opposes this suggestion

and states that there is no basis for enlargement of the administrative record. "The

scope of an APA review of agency actions is generally limited to the administrative

record developed by the agency. . . . The court, however, may allow the parties to

supplement the administrative record in certain limited situations."

ITT Federal Services Corp. v. United States, 45 Fed.Cl. 174, 185 (1999)(citations

omitted).

> Courts have allowed supplementation of the record in the following instances:
>
> (1) when agency action is not adequately explained in the record before the court; (2 ) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

Cubic Applications, Inc. v. United States, 37 Fed. Cl. 339, 342 (1997), quoting, Esch

v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989). See also, Graphicdata LLC v.

United States, 37 Fed. Cl. 771, 779 (1997). In the instant case, the Court finds that

none of the above exceptions apply and that the agency record is adequate.

Accordingly, the Court will consider plaintiff's motion for a preliminary injunction on

the Administrative Record as provided to the Court.


    3. The Source Selection Decision

Olin argues that it will likely succeed on the merits because the decision of the SSA was arbitrary, capricious, irrational, not supported by evidence in the record and illegal.  Each of Olin's arguments will be examined below in turn:

a. Failure to Make a Meaningful Tradeoff Decision and Departure from the Evaluation Scheme.

Olin asserts that the source selection decision fails to mention that Olin was rated as a "Low-Performance Risk," while Alliant was rated as a "Moderate Performance Risk."  Olin also asserts that in the trade-off analysis the SSA addressed performance risk only from the perspective of "Past-Performance" and failed to incorporate the other two factors into the integrated risk assessment.  Olin also alleges that the SSA failed to discuss the particular advantages offered by Olin and explain why these advantages were not worth the price differential.  Finally, Olin argues that the SSA failed to address the risk issues associated with Alliant's low prices.

As to the first argument, Olin states that the SSA's decision did not mention that Olin was a low-risk while Alliant was a moderate risk.  Although the SSA's decision may not have used these precise terms,  it is clear that the SSA considered the relative risks of both Olin and Alliant in making his decision.   The RFP stated:

The proposals will be compared through a Risk Assessment that will document the relative strengths, deficiencies, significant weaknesses, and risks supporting proposal evaluation, assign an overall risk rating, and provide the information necessary to perform any tradeoff among the three evaluation criteria.  Each proposal will be evaluated in terms of

relative strengths, deficiencies, significant weaknesses, and risks. An overall risk rating as defined below will be assigned to each proposal (this will be a summary in recognition of all evaluation factors from the second phase) . . .

AR I, Tab 10, p. 17. The SSA testified at the GAO hearing that he knew that the SSEB had rated Alliant as a "Moderate Risk," for the risk assessment however, he exercised his prerogative as the SSA to reject the SSEB's assessment and instead found that Alliant had a "Moderately Low" Performance Risk. (Transcript of GAO Hearing, pp. 121-124). The SSA testified that "[e]ssentially there was little or no difference in the past performance or technical evaluation process. There was not sufficient differences between either in any of the subfactors except in the area of past performance, which was not a substantial area of difference. So they would be a little bit different. " (Transcript of GAO Hearing, p. 124). Also in his decision the SSA stated:

> In summary, while I recognize the increased performance risk associated with the ATK proposal, I believe those are manageable and acceptable risks. ATK has proven itself capable of producing complex ammunition items. They plan to utilize the facilities and a number of the incumbent work force in the performance of the contract. These factors mitigate the risks. Additionally, ATK has offered the Government very favorable pricing that is substantially lower that either Olin's or [   ].

(AR II, Tab 45, Source Selection Decision, p. 12)

So, it is clear from both his written decision and his testimony before the GAO that the SSA appreciated the differences in the risk ratings for Olin and Alliant and

considered the performance risk from all these factors - not just past performance.

Olin also alleges that the SSA failed to discuss the advantage offered by Alliant. However, the SSA did discuss the advantages which Olin offered in the Source Selection decision. On page 11 of his decision the SSA stated:

> [t]he comparison of Olin to ATK [Alliant] shows that Olin has a advantage over ATK based on Olin's demonstrated successful performance in manufacturing small caliber ammunition to military specifications, and their experience in manufacturing the full spectrum of ammunition required by the solicitation. As addressed before, the performance risk associated by ATK is mitigated by the fact that they have demonstrated the ability to manufacture a variety of complex ammunition items. Olin also has advantages over ATK in the areas of production quality where they have out performed ATK in the areas of initial lot acceptance and lots approved without waivers. Additionally, Olin has demonstrated a greater ability to identify and resolve technical issues prior to production, which is considered very beneficial for this program. Notwithstanding, the past performance and slight technical advantages recognized with the Olin proposal are not significant enough to overcome ATK's significant evaluated price advantage.

(Source Selection Decision Document, pp. 11-12).

With regard to Olin's allegation that the SSA failed to address the risk associated with Alliant's low prices, the SSA stated in his decision that "[t]he Contracting Officer advised ATK in writing on two separate occasions that their prices appeared low. In each case ATK responded with a detailed analysis verifying their prices." (Source Selection Decision, p. 11). In addition, these contracts were firm fixed price contracts and according to the RFP, the "[c]ost is net government outlay." (AR I, Tab 10, p. 17.) As the Contracting Officer explained in answer to a

question posed by one of the offerors: "[i]n other words, it is the price that the offerors propose to the government, not the offeror's cost." (Answer to Question 51, Attachment B to Alliant's Suggestions in Opposition to Motion for Preliminary Injunction).[4] Thus, because these contracts were firm fixed price contracts, if there were any additional costs, they would be borne by Alliant, not the Government. Additionally, the SSA testified at the GAO hearing as follows:

Q.    And you understood that there would be certain additional costs to the Government associated with the award to Alliant?

A.    I would say at the time I made the decision that there was greater risk to the Government that there potentially would be cost to the Government, but this is a firm, fixed-price effort. This is not a cost-type effort that we currently have in place.

Q.    I understand, sir. I'm talking about the additional costs that would be incurred by the Government aside from the price that's paid to the contractor.

A.    I do not consider in an evaluation process those costs incurred by the Government. The Government incurs costs because those people have to be on the job regardless, whatever they're processing. So I do not consider – and besides the potential for how many waivers and deviations, et cetera, et cetera, are going to be presented becomes almost supercilious to put it as part of your evaluation, because I can't tell. No one can tell how Alliant is going to perform over the period of this contract. I mean, that's – that's kind of like projecting that I'm going to get a traffic ticket on the way home and I haven't had one in ten years.

(GAO Hearing Transcript, pp. 157 - 158).

So, contrary to Olin's suggestion, the SSA considered the risk associated with

---

[4] Alliant notes that these pre-proposal Questions and Answers should have been included in the administrative record as they were attached as Exhibit A to Alliant's September 23, 1999 Comments on the Agency Report to the GAO. Accordingly, the Court will consider this as part of the Administrative Record.

Alliant's lower prices, but gave it no weight in his evaluation.

   b. Consideration of Differences Between Olin and Alliant Under the Technical
      Capability and Past Performance Factors.

Olin asserts that the SSA did not consider any of the differences between Olin

and Alliant identified by the SSEB and SSAC under the Technical Capability factor

because Olin and Alliant received the same adjectival rating of "Excellent" for this

factor.   Olin argues that the SSA disregarded his obligations by relying solely on the

adjectival ratings and not considering the documents which were presented to him by

the SSEB and the SSAC.  As to the Past Performance ratings, Olin states that it

received three ratings of Excellent and two ratings of Good, while Alliant received one

rating of Excellent, three ratings of Good and one rating of Satisfactory.   Olin asserts

that despite substantial differences between Olin and Alliant for these two factors, the

SSA disregarded this information and failed to consider these differences.

However, the SSA testified at the GAO Hearing that after he was presented

with SSAC's report, he asked the team to go back and come back with another

evaluation because he did not think that the initial evaluation adequately

documented the differences between the offerors.  He testified:

Q.     Sir, at the time the data was presented to you, you say that there were very,
       very slight differences in past –
A.     That's correct.
Q.     –performance and technical, correct?
A.     That's correct.  That's right.
Q.     And there was a very large difference in cost, right?
A.     That's correct.

Q.     Why didn't you just make the selection at that point?

A.     Because – because I did not feel that the presentation was strong enough at
       that point to make a final decision.  The documents were presented to me
       and I said–simply said to make this kind of decision on a potential billion-
       dollar procurement, I want to make sure that everything is proper.  So I
       want to you go back re–go back through your evaluations and see if there's
       any significant differences  in what you're proposing or what the data
       concludes.

(GAO Hearing Transcript, p. 101).   With regard to a document entitled
"Qualitative"[5] presented to him which listed the qualitative differences between Olin
and Alliant the SSA testified as follows:


A.     I considered this document along with the source selection criteria
       located in the RFP and the conclusions of the SSEB as to the evaluation
       of each of the areas.  The source selection plan does not – does not allow
       for pluses and minuses, et cetera, et cetera.  If everybody is excellent,
       then they are excellent.  There are not variations in that process.  If
       there would have been variations, sir, I could have considered anything
       else that I wanted to, but I could not consider what was not in a
       variation or part of the plan.

Q.     So you didn't consider the relative strengths of the offerors?

A.     Only as presented in accordance with the documentation required by the RFP.
       . . .

A.     That's really the conclusion that I come to, that a number of things on this
       document are not relevant to the source selection process, nor – or that which
       is stated in the RFP.

(GAO Hearing Transcript, pp. 128-133).

       The SSA further testified:

Q.     As part of the selection decision, did you consider the relative strengths of Olin
       and Alliant?

A.     Certainly.

Q.     And you found that Olin –

_____

[5] This document is located in AR II, Tab. 44.

A. As it relates to the evaluations that were done.

Q. You found that Olin had more relative strengths, right?

A. I found that they were low – they had the low risk by virtue of being the incumbent contractor.

Q. I'm talking about the strengths of the two offerors. Was that the only strength you found, that Olin had a lower risk by virtue of being the incumbent contractor?

A. Even on – on tab 44, you'll find that most of that relates to the fact that Olin is in currently on – in the plant working the plant. They have an advantage. That's advantage. That's a distinct advantage in many cases.

Q. Was that the only relative strength you considered for Olin?

A. Wherever there was a clear distinction, I considered it within the evaluation plan.

(GAO Hearing Transcript, pp. 141-42).

Thus, it is clear that the SSA considered the differences between Olin and Alliant under the Technical and Past Performance factors to the extent permitted under the RFP, and that if information was presented to him which was outside of the criteria it was excluded from consideration. The Court fails to see how this constitutes arbitrary and capricious action on the part of the SSA.

c. Rejection of the SSAC's Integrated Risk Assessment.

Olin asserts that the SSA improperly rejected the SSAC's integrated risk assessment by unilaterally altering the rating assigned to Alliant from "Moderate Risk" to "Moderately Low Risk". Olin states that this was improper because there were substantial differences between the proposals regarding the Technical Capability and Past Performance factors and also because the SSA failed to consider how Alliant's low prices impacted the risk assessment. Because the Court addressed these

arguments above, the Court will not re-address them here.

     d.  Failure to Consider SSEB's Comparative Analysis

     Olin asserts that the SSA failed to consider the SSEB's July 1, 1999

comparative analysis.  (AR II, Tab 42).   However, the SSA testified that the SSEB

> . . . brought back this document which has a tendency to ignore the
> evaluation process and be outside the evaluation source selection
> process.  And in many ways cannot be considered as part of the source
> selection because they're not – it'd be unfair to use this in favor of one
> contractor and not favor the other contractors.  They would have to
> know it, we'd have to issue a modification to contract and say this is
> what we're considering as part of the source selection.  That was not the
> case.
> . . .

Q.    For instance, go to page 4.  At the very top – and look on page 3 if you want,
but what I'm referring to, it's on the very top where it's talking about ATK's
inexperience regarding 50 caliber items, they say according to the SSEB could
lead to production problems and non or late delivery of 20 percent of the
evaluated items in this acquisition.  Do you see that?

A.    Yep.

Q.    Now, that's something that bears on delivery schedule, correct?

A.    Okay.

Q.    And production, right?

A.    Right.

Q.    Now, delivery schedule and production was part of the evaluation criteria –

A.    That's true.

Q.    – under technical, wasn't it?

A.    That's correct.

Q.    Now, how, if at all, did you consider that comment in the evaluation?

A.    They did not.  They did not lower their rating.

Q.    And what –

A.    The overall rating – the overall rating remained excellent for each party.  I
think it was each party got excellent in that category.

Q.    And did you –

A.    They did not lower the rating.  So they made these comments and I said, my
question is what's the value of this, if in fact you're still performing at – you're
saying this but you haven't changed any ratings for one contractor or the

other? I said it's useless information for me.

Q.      Any my question, sir, is did you ask them why they didn't change the rating?

A.      Yes, I did. And they said there's insufficient – there's insufficient to change the rating. I said well, then it even has less value as far as my overall selection process is concerned because I have to retain the integrity of the process. I can't use data that in fact will in turn be considered spurious data. It's got to be information that in fact will change your evaluation process.

. . .

THE WITNESS:      Well, that's my point, My point is – my point is that this document was generated, generally a negative document at Alliant. The document is outside the source selection process in that it does not go back to the source selection process and change past performance, technical or quality performance and that's where it has to relate back to.

. . .

A.      This document, this tab 42 was the document that clearly indicates that there's a – there's a swing by them to retain Olin. I mean, this is very clear. Even I can figure this out. And –

Q.      But they weren't willing to reduce the –

A.      Correct.

Q.      – adjectival ratings.

A.      That's correct.

Q.      So you did not give it much credence because they weren't –

A.      That's correct.

Q.      – willing to change the ratings.

A.      That's correct. Now, a couple of the items that were in here were not – as we discussed, as the Government costs versus contract cost for deviations, waivers and so forth, et cetera – were not considered in the manner in which they did this, because they should have considered some of that stuff as parts of the evaluation.

I went back to these documents to find out after they had departed if there was any way that they would play into changing what appeared to be was going to be my decision. They did not. And if the team was unwilling to do that and there was no documentation except just generalized comments, I did not take it seriously. It's kind of nice-to-know information.

(GAO Hearing Transcript, pp. 163 - 169).

Thus, the testimony of the SSA demonstrates that the did not fail to consider

the SSEB's Comparative Analysis, he simply found that the memorandum contained information which would have been either improper for him to consider or which he did not find helpful in his determination.   The Court does not find that this constitutes arbitrary or capricious behavior.

Although Olin makes several individual arguments in support of its assertion that the SSA's decision was flawed, Olin's main argument is that the SSA did not give enough weight to the differences which the SSEB and SSAC identified. However, in a case with similar facts, the Court found that SSA properly exercised his discretion in making a technical/cost tradeoff.   In <u>ITT Federal Services Corp. v. United States</u>, 45 Fed. Cl. 174 (1999), the losing bidder alleged that the SSA had conducted an improper cost/technical tradeoff by placing a greater weight on the price factor.   The losing bidder alleged that the SSA improperly evaluated the proposal on a "low cost, technically acceptable" basis, rather than the "best value" standard as required by the procurement.   The Court noted that "[i]n reviewing a government procurement, the court should defer to an agency decision that is 'grounded in reason' even if the court itself might have chosen a different bidder. . . . 'Procurement officials have substantial discretion to determine which proposal represents the best value for the government.'" <u>Id</u>. at 192-93 (citations omitted).  The Court noted that in that procurement, the three evaluation criteria included:  Management/Technical, Past Performance and Price.  Although price was of lesser importance than the other

criteria, it was still an important factor in evaluating the overall value.   In evaluating

the proposal, the SSA noted that ITT's proposal was exceptional and that Northrop's

proposal satisfied the solicitation's criteria.   The SSA in a note wrote:

> I could not find significant difference [sic] except ITT's experience in
> running sites under the current contract.  While this is a significant
> benefit, [i]t is not sufficient to overcome the cost delta in the two
> proposals.

ITT alleged that the SSA's note indicated that he failed to appreciate the

technical superiority of ITT's proposal and did not conduct a technical/cost trade off.

However, the Court disagreed stating:

> A review of the SSA's written decision and his hearing testimony shows
> that the SSA considered the SSET's evaluations and noted that the
> technical weakness of Northrop's proposal would impose a burden on
> the government. The SSA nevertheless determined that the burden was
> "substantially" outweighed by the cost savings.  Although the
> solicitation placed greater weight on the Management/Technical and
> Past Performance aspects of the submitted proposals, [the SSA]
> understood that it did not ignore cost considerations.  The court finds
> that the SSA performed a technical/cost tradeoff and documented the
> rationale for the tradeoff as required by FAR § 15.308.  The SSA
> exercised his judgment regarding the "best value" to the government. . . .
> The court declines to substitute its judgment for the judgment of the
> agency's procurement official.
> . . .
> Here the source selection decision reflects a cost/technical tradeoff
> decision in which the SSA reasonably determined that the cost savings
> of $4.5 million dollars or 8.4% in selecting Northrop was not offset by
> the superior characteristics of ITT's Management/Technical proposal.

Id. at 193-94.

Similarly, in the instant case, the Court finds that the SSA properly exercised

his discretion in determining that the slight advantages offered by Olin were not worth the significantly greater cost, and that the  greater risk in selecting  Alliant  was manageable and acceptable considering the cost savings.

4. Past Performance Evaluation

Olin asserts that the Past Performance Evaluation was flawed because an agency cannot ignore information in its possession concerning an offeror's past performance simply because the information was not supplied by the offeror.  Olin asserts that the Army had information in its possession information concerning significant problems experienced by the Army, Navy and Air Force on various other Alliant contracts, but that the Army failed to take this information into account in the Past Performance evaluation.   Olin asserts that the failure to consider this information violated  FAR § 15.305(a)(2)(ii), 48 C.F.R. Ch. 1.[6]   Olin also states that this information was never presented to the SSA.

Although, the SSA testified at the GAO Hearing that he had never seen this specific  document before, the SSA testified that he was aware that Alliant "had quality problems with certain types of projectiles. . . . They had – they had  some quality problems that were related into the evaluation of their proposal as part of the

_____

[6] This regulation states that in conducting the past performance evaluation, "[t]he Government shall consider this information, as well as information obtained from any other sources, when evaluating the offeror past performance.  The source selection authority shall determine the relevance of similar past performance information."

past performance. They received a satisfactory, as I recall, for that area." (GAO

Hearing Transcript, pp. 149-150). Furthermore, the Chairman of the SSEB, Sharon

Nathan testified that although she does not recall whether the SSEB or the SSAC had

this specific information at the time it performed its past performance evaluation, this

type of information was discussed. (GAO Hearing Transcript, pp. 23-26).

Additionally, the SSEB and the SSEC both had access to other information about

Alliant's past performance, such as Alliant's lot rejection rates and its requests for

waivers, engineering change proposals and requests for deviations. This information

was reflected in Alliant's Past Performance Ratings. (July 1, 1999 Comparative

Analysis of Small Caliber Ammunition Offerors, AR II, Tab 42). Therefore, the

Court finds that because this type of information was available and considered by the

SSAC, the SSEB and the SSA, that Alliant's Past Performance Evaluation was not

flawed.

5. Post-Best and Final Offer Discussions

In negotiated procurements, after the initial proposals are submitted and a

competitive range is determined, the agency engages in discussions with those

offerors. The discussions are conducted in order to allow the offerors an opportunity

to revise their proposals. On June 8, 1999, the Contracting Officer issued

Amendment 5 to RFP 0121, closing discussions and establishing June 10, 1999 as the

cut-off date for the submission of best and final offers. Olin, Alliant and another

company all submitted their best and final offers on or about June 10, 1999. On

June 28, 1999, the Army sent a letter to Alliant, setting forth concerns about Alliant's

proposed cost saving measures. The letter ended with, "[a]fter your consideration of

the above analysis, your company may wish to confirm or revise your proposal. You

are requested to reply to this letter before close of business on July 6, 1999." (AR II,

Tab 26, at 3). Alliant sent back a handwritten response on July 1, 1999 and then a

more detailed response on July 2, 1999 stating that there were no errors in their

proposal and that they were submitting information for back up purposes only which

was not a change or revision to their proposal. (AR II, Tabs 27 & 28). Olin asserts

that these communications with Alliant constituted improper post best and final offer

discussions and that the SSA relied on Alliant's response in his Source Selection

Decision. (AR II, Tab 45, at 11).

Alliant responds that improper discussions do not occur when the Government

contacts an offeror only to clarify uncertainties or irregularities in its bid, provided

that the offeror is not given an opportunity to make modifications or revisions of its

proposal which would be essential to the Government's acceptability determination.

(Alliant's Suggestions in Opposition, p. 50). However, in Reply, Olin points out that

clarification procedures "may be used in negotiated procurements only where the

mistake is disclosed after award, FAR § 15.508, or where the agency does not

contemplate opening discussions, FAR § 15.306(a)(1)." (Olin's Reply Suggestions,

pp. 20-21).   As the Court in <u>Dubinsky v. United States</u>, 43 Fed.Cl. 243, 262 (1999),

explained, "subsequent to the 1997 rewrite of Part 15, clarifications are defined as

'limited exchanges, between the Government and offerors, that may occur when

award without discussions is contemplated.' . . . Clarifications thus are exchanges

conducted in procurements where discussions are not expected to be held; the term

has no application to exchanges that occur after discussions have been conducted

with offerors."

Of all the issues raised by Olin, this issue is the one which would appear to

present the most serious challenge to the award to Alliant.   However, in addition to

showing that post best and final offer discussions occurred, Olin must also establish

that they were prejudiced by these discussions.   "[T]o prevail in a protest the

protestor must show not only a significant error in the procurement process, but also

that the error prejudiced it."   <u>Data General Corp. v. Johnson</u>, 78 F.3d 1556, 1562

(Fed.Cir. 1996); <u>Strategic Analysis, Inc. v. United States Dept. of  Navy</u>, 939 F.Supp.

18, 23 (D.D.C. 1996).   "To establish prejudice, a protestor is not required to show

that but for the alleged error, the protestor would have been awarded the contract . . .

[Rather], to establish prejudice, a protestor must show that, had it not been for the

alleged error in the procurement process, there was a reasonable likelihood that the

protestor would have been awarded the contract."   <u>Data General</u>, 78 F.3d at 1562.

In the instant case, Olin asserts that the communications were "inherently

prejudicial to Olin because they were considered by the SSA and used to confirm the acceptability of Alliant's proposal." (Olin's Reply Suggestions, p. 23). Olin is incorrect in this regard because nothing changed as a result of the post best and final offer discussions. Alliant did not increase or decrease its prices, but simply submitted back up information to confirm its original prices. There was not a question that Alliant had a technically acceptable proposal before the discussions. It would be a different matter if there had been a question regarding the technical acceptability of Alliant's proposal and Alliant changed something as a result of the post best and final offer discussions. However, this is not the case. Accordingly, although these discussion may have been in violation of the procedural procurement regulations, the Court does not find that these discussions in any manner prejudiced Olin.

After reviewing all of Olin's substantive and procedural challenges to the instant procurement, the Court does not find that Olin has demonstrated a likelihood of success on the merits. Accordingly, this factor does not weigh in Olin's favor in the preliminary injunction analysis.

**B. <u>Threat of Irreparable Harm</u>**

Olin believes that it will suffer irreparable harm if the transition at the LCAAP is not enjoined for three reasons: 1) confidential and proprietary information will be disclosed if a preliminary injunction is not granted; 2) the transition activities currently underway are disrupting Olin's operations and threatening its ability to

fulfill its contractual obligations prior to the expiration of its contract and 3) without a preliminary injunction, Olin will sustain lost profits when Alliant begins actual production operations in April 2000, which losses cannot be recovered in an action at law.

1. Confidential and Proprietary Information

Olin states that it employs two proprietary processes in the manufacture of ammunition at the plant.  Olin states that  Alliant has been visiting the plant with increasing frequency and will soon begin interviewing and hiring its employees.  Olin states that this interviewing and hiring creates a significant danger that its proprietary trade secrets will be revealed to Alliant.  Olin states that this alone constitutes irreparable harm sufficient for a court to enter a preliminary injunction.  However, what Olin ignores is that this is a matter within Olin's control.  The Army states that it has not required, nor does it intend to require Olin to disclose either manufacturing processes that are solely proprietary to Olin, or any confidential commercial or financial information.  The Army states that as requests are made by Alliant, these are coordinated with Olin and if Olin objects to a specific request, then that together with Olin's objection is reviewed to determine the appropriateness of releasing the information in question.  (Army's Suggestions in Opposition, p. 16).   Olin also argues that the inadvertent disclosure of this proprietary information may unfairly assist Alliant in preparing any new proposal in the event a new competition were to

be ordered.  However, as Alliant points out, it was initially awarded the contract and submitted a bid which was $192 million dollars less than Olin's bid, without access to any proprietary information.   The Court finds that there are adequate procedures in place to prevent the disclosure of Olin's confidential and proprietary information and does not find the possibility of such disclosure constitutes "irreparable harm."

2. Disruption During the Transition Process

Olin asserts that the transition process is disruptive to its current operations at the plant and that the interviewing and hiring of Olin's personnel threatens its ability to manufacture and deliver the ammunition under its current contract.

Alliant states that Olin's contract requires Olin to "disclose necessary personnel records and allow the successor to conduct onsite interviews with these employees." FAR 52-237.3 (1984).  Alliant further states that most of the hiring will not be effective until after the completion of the Olin contract in April 2000.  Alliant notes that there are procedures in place to minimize disruption.  For example, if Alliant personnel wish to enter the plant they must first go to the administrative area and inform the plant manager of their presence.  If they wish a tour of a certain area, they must request this from the plant manager or his designees and establish a mutually agreeable time.  Additionally, Alliant personnel are not allowed to speak with Olin employees without first informing Olin management.  (Affidavit of Joseph Schaub, ¶ 18; Exhibit A to Alliant's Suggestions in Opposition).

Olin also asserts that another irreparable injury caused by the transition would be from Alliant back to Olin if the preliminary injunction is denied, but Olin later prevails on the merits. The Court finds this possible injury too speculative on which to base a preliminary injunction. "Possible or speculative harm is not enough to warrant a preliminary injunction." <u>Citicasters, Inc. v. McCaskill</u>, 883 F.Supp. 1282, 1290 (W.D.Mo. 1995), <u>rev'd on other grounds,</u> 89 F.3d 1350 (8th Cir. 1996); <u>Bloom v. O'Brien</u>, 841 F.Supp. 277, 279 (D.Minn. 1993)(same).

3. Inability to Recover Lost Profits

Olin states that if a preliminary injunction is not issued and a trial on the merits is not held until after April 2, 2000, that the transition of the plant from Olin to Alliant will be complete and from that point forward, all sales of ammunition and profits on those sales will belong to Alliant. Olin states that if it prevails at a trial on the merits, it will have been wrongfully deprived of the profits it could have earned. Olin states that in procurement actions, these lost profits are viewed as constituting irreparable harm, because Olin cannot recover these lost profits, but would instead be limited to its bid preparation costs. Although courts have recognized that in some instances this can constitute irreparable injury, this factor must be considered in conjunction with the other preliminary injunction factors, such as the balance of harms which the Court will address next.

**C. <u>Balance of Harms</u>**

The Army notes that Olin has been provided with sufficient work through April 2, 2000. If a preliminary injunction were issued and Olin was allowed to remain at the plant past that date, the Army states that either the existing work force would have to be laid off due to a lack of work or the Army would have to award additional work to Olin in order to keep production going. In order for the Army to provide additional work to Olin, it would have to alter its contract with Alliant, thus reducing the amount of ammunition ordered from Alliant. The Army notes that if the quantities ordered are reduced because of a preliminary injunction, then the cost of the remaining items may increase, thus increasing the cost to both the government and the taxpayer.

Alliant states that it will also suffer significant harm if a preliminary injunction were issued. Alliant states that if there is a thirty day delay in the transition, Alliant would lose $8 - $10 million in revenue. For a sixty day delay, the cost would be $16-$20 million. Alliant also states that if there were a thirty or sixty day delay, the Army would most likely extend Olin's contract by an additional quarter or one year. (Schaub Affidavit, ¶ 16).

"The court must balance [the] . . . potential harm to both the parties in deciding whether to grant injunctive relief. . . . The balance of harm must tip decidedly toward the plaintiffs to justify issuing a preliminary injunction." Bloom, 841 F.Supp. 277, 280 (citations omitted). In this instance the Court does not find

that the balance of harm tips decidedly in plaintiff's favor. The potential loss of profits which Olin may suffer if the injunction is not issued is balanced by Alliant's potential lost revenues if the injunction is issued. The Court simply does not find that Olin would suffer a greater harm than the other parties. Therefore, the Court finds that this factor also does not weigh in favor of granting the preliminary injunction, as the harm to Alliant would be equal to the harm suffered by Olin.

### D. **The Public Interest**

Olin asserts that the public has an ongoing interest in ensuring that the integrity of the procurement laws are preserved, and that granting Olin's request for a preliminary injunction will serve the public interest in protecting the integrity of the procurement process. Alliant states that the public interest will be best served by upholding the Army's award of the contracts to Alliant. Because the Court does not find that Olin has demonstrated a likelihood of success on the merits or shown that the integrity of the procurement process was jeopardized in any way, the Court finds that this factor does not weigh in favor of granting a preliminary injunction.

### III. CONCLUSION

After reviewing all of the above factors, the Court does not find that issuance of a preliminary injunction is warranted in this instance. Although the Court finds that there is a risk of irreparable injury to Olin from lost profits if it ultimately succeeds on the merits, the Court finds that this risk is balanced by Alliant's equal risk of lost revenues if the preliminary injunction is granted and Olin ultimately loses

at trial.  Additionally, the Court finds that Olin has not demonstrated a likelihood of success on the merits and the public interest does not necessitate the entry of a preliminary injunction,  so for these reasons, the Court hereby **DENIES** Olin's Motion for a Preliminary Injunction.

Date: February 17, 2000          **/s/  FERNANDO J. GAITAN, JR.**
Kansas City, Missouri          Fernando J. Gaitan Jr.
                               United States District Judge